336 So.2d 1133 (1976)
Vernon Ray COOPER, Appellant,
v.
STATE of Florida, Appellee.
No. 45966.
Supreme Court of Florida.
July 8, 1976.
Rehearing Denied September 28, 1976.
*1136 Richard W. Ervin, III, Public Defender, and Judith J. Dougherty, Asst. Public Defender, for appellant.
Robert L. Shevin, Atty. Gen., and Raymond L. Marky, Asst. Atty. Gen., for appellee.
PER CURIAM.
Vernon Cooper was convicted of the robbery of a grocery store in Pensacola and the first degree murder of Pensacola Deputy Sheriff Charles Wilkerson. He was sentenced to death by the trial judge following the jury's advisory sentence of death. We have jurisdiction to review this case under Article V, § 3(b)(1) of the Florida Constitution.

FACTS
Cooper admitted at trial that he and one Steve Ellis robbed the grocery store, and that as they were making their escape in Cooper's black Camaro they were stopped by Deputy Wilkerson, who had stationed himself close to Interstate 10 in order to close off a possible escape route. There was conflicting testimony as to what then transpired. After being stopped, either Cooper or Ellis walked to Deputy Wilkerson's patrol car and fired two shots into his head. He was killed instantly.
A prompt report of Wilkerson's death caused officers Bates and Joy to begin patrolling Interstate 10. They observed and stopped the Camaro after it had crossed into Alabama. Ellis, who was driving, left the Camaro and approached Bates, who began to frisk him. Joy approached the Camaro, observed Cooper sitting in the passenger's seat, and returned to his patrol car. While doing so, he heard a shotgun fired from inside the Camaro. At that moment Ellis pulled a gun on Bates, but Bates reacted faster and shot Ellis fatally. Cooper then drove off in the Camaro. Both the officers fired several shots and gave chase, but Cooper escaped into the countyside. Cooper was captured the next day, with a shotgun in his possession, after a manhunt by over four hundred persons.

ALLEGED TRIAL ERRORS
Before us Cooper has argued that at least seventeen errors marred his trial. Many of these alleged errors are devoid of merit and deserve only passing discussion.[1] A few require more extensive analysis.
*1137 1. Inadmissible statements. Cooper raises a threshold issue of whether he was properly advised of his constitutional rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and whether a subsequent statement was voluntarily given. The arresting officer, acting to insure Cooper's safety, placed him in a squad car and informed him of his constitutional rights. Cooper then acknowledged his understanding of his rights and was taken to a temporary headquarters set up by the police. He was given a refreshment, and Alabama officers entered the car. He was then questioned for a short time, at which time he told the same story he would later tell at trial. Although there were some members of the search party in the area around the car at this time, they were orderly and were not shown to have made threats of any sort. The trial judge made a thorough inquiry into these matters, and he concluded that the warning was understood and the statements voluntarily given.
We find no reason to reverse the trial judge's determination. The factual circumstances were not inherently intimidating. The trial judge properly inquired to determine whether Cooper was coherent and aware of what he was doing.[2] The state had the burden to prove voluntariness by a preponderance of the evidence,[3] and the trial judge did not err in finding that the burden was carried.
2. State violations of criminal rules. Cooper seeks a reversal of his conviction on the ground that the state violated the rules of criminal discovery. On Wednesday, June 12, 1974, five days prior to trial, the state provided defense counsel with the names of seven witnesses and informed him of the existence of a four-hour tape recording of police messages which had been recorded by a private citizen tuned in to the broadcast frequency of the sheriff's office. The state's attorney had learned of these witnesses and the tape only a few days earlier. Defense counsel moved for a continuance in order to conduct discovery and study any new evidence. A hearing was held, after which the motion was denied with leave to ask for reconsideration should any relevant new matters be uncovered. On the morning of Monday, June 17, 1974, defense counsel renewed his motion for a continuance. Again a hearing was held and the motion was denied. At both hearings it was uncontroverted that the state's attorney supplied defense counsel with the new witnesses' names soon after he learned of them, and that all but one were in possession of information which was identical to that known by other, previously identified witnesses. Only one of these witnesses was called to the stand during the trial, and he only testified for a few minutes.
The only new evidence of any significance to emerge from these late revelations was the tape, which served to place in chronological order the various pieces of other evidence. Defense counsel failed to complete his review of the tape prior to trial due to his unwillingness to retain possession of the tape out of the presence of the state attorney, fearing the consequence of possible damage to the tape.
As the trial date nears, a prosecutor has the duty under Rule 3.220(f) to "promptly disclose" previously unidentified witnesses and material. A delay of days *1138 might be sufficiently prompt where several months remain before trial, but where a complex trial involving a human's life was scheduled to begin in one week, immediate disclosure is dictated by the Rule. Nonetheless, failure to obey the Rule should be remedied in a manner consistent with the seriousness of the breach. Relevant evidence should not be excluded from the jury unless no other remedy suffices.[4] Here the trial judge properly denied the initial request to postpone the trial on the ground that any prejudice could be best assayed after defense counsel had an opportunity to depose the witnesses. By directing the state's attorney to act speedily in making these witnesses available, the trial judge did all that was reasonably required at that time. When he later reconsidered the motion, the witnesses' testimony was found to be cumulative and non-prejudicial. The only hardship then shown by the defense was the failure to have listened to all of the tape, causing an increased burden on defense counsel during the week of the trial. The trial judge concluded that there was no prejudice to Cooper's defense, and that the increased workload was in part the result of a tactical decision by the defense rather than the state's breach of the rules.
Our rules were not designed to eliminate the onerous burdens of trial practice. Their purpose was to avail the defense of evidence known to the state so that convictions would not be obtained by the suppression of evidence favorable to a defendant, or by surprise tactics in the courtroom. While death penalty cases command our closest scrutiny, it is still the obligation of an appellate court to review with caution the exercise of experienced discretion by a trial judge in matters such as a motion for a continuance. We cannot say that the judge's discretion was palpably abused in this case.[5]
On the third day of trial, another breach of Rule 3.220(f) became apparent when the state announced that a ballistics expert had been inadvertently left off its list of witnesses. In accordance with our holding in Richardson v. State, 246 So.2d 771 (Fla. 1971), the trial judge held a lengthy hearing to determine whether the defense had been unfairly surprised. He ascertained that there was no surprise. The defense had learned that a ballistics test was being performed as early as February 1974, in the course of deposing a witness. During March 1974, defense counsel's investigator spoke to the state's expert and requested that a copy of any ballistics report be sent to defense counsel. The investigator customarily placed memoranda summarizing his activities in counsel's case file, and there was no showing that this did not occur in this instance. For this reason, defense counsel should at least have been aware that a request for any ballistics report had been made and that the investigator had been in contact with this particular expert. Additionally, the state attorney informed the defense one month before trial that the gun which had been in Ellis' possession when he was apprehended and fatally shot was not the same gun which had fired the fatal shots at Deputy Wilkerson. This fact was the substance of the expert's testimony at trial. It must have been obvious to defense counsel that a ballistics report had been received by the state, and that the state was going to attempt to prove that Cooper himself fired the fatal shots, rather than relying solely upon a felony-murder theory.
Once again the state may have violated a Rule. But when that fact was discovered, the trial judge properly denied the request to exclude the witness or to recess the trial to enable defense counsel to obtain a ballistics expert of his own. Seeking a less drastic remedy, he recessed the court to allow the defense counsel to depose the expert *1139 before he was called to the stand. Since the defense should have been aware of the state's proposed proof by reason of information already known to it, the trial judge acted within the scope of his discretion to remedy whatever prejudice might have resulted from the state's breach.

ALLEGED SENTENCING ERRORS
Cooper attacks the sentencing aspect of his trial on several grounds.
1. Proffers in mitigation. His first alleged error was the trial court's refusing, on grounds of relevance, proffered testimony concerning Cooper's employment prior to the crime, Ellis' reputation for violence, and Cooper's attempts to avoid Ellis on some prior occasions. Defense counsel sought to have this testimony admitted to show that Ellis had probably fired the fatal shots, and that Cooper was not beyond rehabilitation. While the trial court rejected these proffers, he did permit great latitude in the admission of evidence, some questionably probative or relevant, regarding Cooper's character and his general reputation for veracity and non-violence.
We held in State v. Dixon[6] that the rules of evidence are to be relaxed in the sentencing hearing, but that evidence bearing no relevance to the issues was to be excluded. The sole issue in a sentencing hearing under Section 921.141, Florida Statutes (1975), is to examine in each case the itemized aggravating and mitigating circumstances. Evidence concerning other matters have no place in that proceeding any more than purely speculative matters calculated to influence a sentence through emotional appeal. Such evidence threatens the proceeding with the undisciplined discretion condemned in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).[7]
Testimony regarding Ellis' temperament and Cooper's attempts to avoid Ellis on a few occasions reflected events and opinions too removed from the planning of the robbery and commission of the murder for there to be any rational basis on which the jury could conclude that Cooper acted under Ellis' domination. Similarly, those facts could have no probative bearing on whether Cooper or Ellis fired the fatal shots.
As to proffered testimony concerning Cooper's prior employment, it is argued that this evidence would tend to show that Cooper was not beyond rehabilitation. Obviously, an ability to perform gainful work is generally a prerequisite to the reformation of a criminal life, but an equally valid fact of life is that employment is not a guarantee that one will be law-abiding. Cooper has shown that by his conduct here. In any event, the Legislature chose to list the mitigating circumstances which it judged to be reliable for determining the appropriateness of a death penalty for "the most aggravated and unmitigated of serious crimes,"[8] and we are not free to expand the list.
2. Instructions as to aggravating circumstances. The trial judge instructed *1140 the jury to consider whether this murder was "especially heinous, atrocious or cruel," an aggravating circumstance listed in Section 921.141(5)(h). Cooper contends this was improper because, as a matter of law, the murder was not "especially heinous". While we agree that Deputy Wilkerson was not murdered in the "especially heinous" manner contemplated by the statute, we do not believe it was error for the trial judge to instruct the jury on every aggravating and mitigating circumstance listed in Section 921.141, in the absence of trial counsels' acquiescence to the omission of one or more circumstances.
The Legislature intended that the trial judge determine the sentence with advice and guidance provided by a jury, the one institution in the system of Anglo-American jurisprudence most honored for fair determinations of questions decided by balancing opposing factors. If the advisory function were to be limited initially because the jury could only consider those mitigating and aggravating circumstances which the trial judge decided to be appropriate in a particular case, the statutory scheme would be distorted. The jury's advice would be preconditioned by the judge's view of what they were allowed to know. The judge should not in any manner inject his preliminary views of the proper sentence into the jurors' deliberations, for after the jury has rendered its advisory sentence the judge has the affirmative duty to decide the sentence in the context of his exposure to the law and his practical experience. As we acknowledged in Dixon, "[t]o a layman, no capital crime might appear to be less than heinous, but a trial judge with experience in the facts of criminality" can serve as a buffer where the jury allows emotion to override the duty of a deliberate determination.[9]
Of course, a proper instruction defining the terms "especially heinous, atrocious or cruel," or any other listed circumstance, must be given. Here the trial judge read the jury the interpretation of that term which we gave in Dixon. No more was required.
3. Weighing of factors. The final point raised is whether the death penalty was the proper sentence. The trial judge found there to be four aggravating circumstances:
"1. The defendant was previously convicted of two felonies involving the use or threat or violence to persons; namely, armed robbery.
2. The murder was committed while the defendant was in the perpetration of a robbery and in flight after committing a robbery.
3. The murder was committed for the purpose of avoiding or preventing the lawful arrest of the defendant.
4. The capital felony was especially heinous, atrocious and cruel."
The defense had argued in mitigation that the evidence showed Cooper played a relatively minor role in the murder. As the defense interprets the evidence, Ellis fired the fatal shots and Cooper was guilty of only felony-murder. The trial judge believed Cooper fired the fatal shots and found there to be no mitigating circumstance.
In argument here on review of the judge's sentence, Cooper contends that the murder was not "especially heinous" as a matter of law and that the trial judge ignored the evidence in finding that Cooper fired the fatal shots. The state responds with the contention that this murder was especially atrocious because it was unnecessary to kill Deputy Wilkerson, since escape was otherwise possible.
While we agree with the state that this execution-type murder may have been unnecessary, we agree with Cooper *1141 that the standard of an aggravating circumstance is whether the horror of murder is "accompanied by such additional acts as to set the crime apart from the norm ... the conscienceless or pitiless crime which is unnecessarily torturous to the victim."[10] This murder was not in that category. Deputy Wilkerson was killed instantaneously and painlessly, without additional acts which make the killing "heinous" within the statutorily-announced "aggravating" circumstance.
We have closely scrutinized the record to determine whether it supports the trial judge's conclusion that Cooper fired the fatal shot. There was conflicting testimony on this point. No one saw the actual shooting except, of course, Cooper. One witness standing about 100 feet from the scene of the crime testified that he saw a man of Cooper's height and build run from the driver's side of the patrol car to the driver's side of the Camaro, although the scene was illuminated only by the headlights of the two cars. He could not say whether the man entered the driver's side of the Camaro. Another witness, who was driving past the scene, saw a man coming from the direction of the patrol car enter the passenger's side of the Camaro. A third witness, who had been standing about 100 yards away, testified to a belief that the sound of a slamming car door had come from the driver's side of the Camaro. At no time was he able to see anyone in the vicinity of the cars, however, and a state objection to this testimony as mere opinion was sustained. Cooper testified that Ellis followed the Deputy to the patrol car, fired two shots, returned to the Camaro, and drove off. Cooper said he was in the passenger's seat, where he was later found, at all relevant times.
Cooper suggests that the trial judge erred in excluding testimony concerning the source of the sound of the slamming door. While opinions on the direction of a sound are usually admissible because there is no satisfactory way such observations can be otherwise reproduced in the courtroom,[11] we have recognized that difficult questions concerning opinion evidence can arise which can only be controlled by the discretion of the trial judge.[12] In cases where the direction of a sound was at issue, lay opinion has been allowed into evidence where there was some basis to conclude that the witnesses' conclusions were not pure speculation.[13] The issue here was not the general direction from which a sound came, but the pinpointing of a sound to a precise source by a person blinded by darkness and standing 100 yards away. The speculative quality of a conclusion based on the human sense of hearing in such a situation is too great, and the trial judge properly excluded it. In any event, we cannot find that exclusion prejudicial in light of other events at the trial. After the trial judge had sustained the state's objection, counsel for the state extensively questioned the witness on cross-examination as to his belief that the driver's door had been slammed. Defense counsel continued the subject on redirect examination, and it was developed further on recross-examination. Whatever the technical effect of sustaining an objection, it is clear that the jury well knew all facets of this witness' observations.
Since we have concluded that the proper evidence was considered by the trial court in determining whether Cooper fired the fatal shots, we have no basis to reverse his conclusions. He heard the testimony and *1142 observed the witnesses. The record supports his conclusion.[14]
Imposition of the death penalty is never pleasant. Here it cannot be avoided. The statute demands a decision from this Court, and we are bound to follow the law. In this case there were three aggravating and no mitigating circumstances. There is no alternative to the death penalty.
Accordingly, the judgment of guilty of murder in the first degree and robbery is affirmed, and the sentence of death is approved.
It is so ordered.
OVERTON, C.J., and ROBERTS, ADKINS, BOYD, ENGLAND, SUNDBERG and HATCHETT, JJ., concur.
NOTES
[1] Cooper argues as a matter of law that Section 921.141, Fla. Stat. (1975), authorizing the death penalty in certain cases, is unconstitutional. A majority of the Court recently considered and rejected this contention, and we are bound by those decisions. Alford v. State, 307 So.2d 433 (Fla. 1975); State v. Dixon, 283 So.2d 1 (Fla. 1973). Cooper argues from the record that the trial judge erred in refusing (i) to sever the charges of robbery and murder, (ii) to grant a change in venue, (iii) to refuse to appoint more than two psychiatrists to examine him for competency to stand trial, (iv) to suppress an allegedly coerced confession which was never introduced into evidence, (v) to exclude alleged irrelevant evidence found in Cooper's automobile, (vi) to not extend the time of trial for a few minutes past 5:00 P.M. on one day of this lengthy proceeding, (vii) to change the sequence of closing arguments from that which is customary in Florida when Crim.Proc. Rule 3.250 does not apply, and (viii) to clarify jury instructions distinguishing between first and second degree felony murder. These rulings were all proper in the circumstances of this case. See State v. Dixon, above, as to jury instructions; Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589, 43 L.W. 4730 (1975), as to venue, and Fla.Crim.Proc. Rule 3.210(a), as to expert testimony where there is no reason to question competency. The trial judge did not abuse his discretion in refusing to grant severance, since a conviction for felony-murder was possible. Campbell v. State, 227 So.2d 873 (Fla. 1969). As to other points, the record shows no prejudice which would warrant a reversal of Cooper's conviction.
[2] See, Paramore v. State, 229 So.2d 855 (Fla. 1969).
[3] Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); McDole v. State, 283 So.2d 553 (Fla. 1973).
[4] Williams v. State, 264 So.2d 106 (4th DCA 1972).
[5] Andrews v. State, 134 Fla. 450, 184 So. 88 (1938).
[6] 283 So.2d 1, 7 (Fla. 1973). The general standard of relevance is explained in Atlantic Coast Line Ry. v. Campbell, 104 Fla. 274, 139 So. 886 (1932).
[7] The legislative intent to avoid condemned arbitrariness pervades the statute. Section 921.141(2) requires the jury to render its advisory sentence "upon the following matters: (a) Whether sufficient aggravating circumstances exist as enumerated in subsection (6); (b) Whether sufficient mitigating circumstances exist as enumerated in subsection (7), which outweigh the aggravating circumstances found to exist... ." (emphasis added). This limitation is repeated in Section 921.141(3), governing the trial court's decision on the penalty. Both sections 921.141(6) and 921.141(7) begin with words of mandatory limitation. This may appear to be narrowly harsh, but under Furman undisciplined discretion is abhorrent whether operating for or against the death penalty.
[8] State v. Dixon, 283 So.2d 1, 7 (Fla. 1973).
[9] State v. Dixon, above, n. 8, at 9.
[10] State v. Dixon, above n. 8, at 9.
[11] See, Alford v. State, 47 Fla. 1, 8, 36 So. 436, 438 (1904): VII J. Wigmore, Evidence § 1977 (1940).
[12] Kersey v. State, 73 Fla. 832, 74 So. 983 (1917).
[13] See e.g., Hornsby v. Commonwealth, 305 Ky. 747, 205 S.W.2d 338 (1947); Smith v. State, 182 Md. 176, 32 A.2d 863 (1943); State v. Shinborn, 46 N.H. 497 (1866).
[14] Our disposition of this issue renders it unnecessary to consider whether a mitigating circumstance exists in a felony-murder situation solely because the defendant did not perform the act of killing.